# MUNSTER v. ASHWORTH.

PATENTS; INTERFERENCE; BURDEN OF PROOF; AFFIDAVITS; WITNESSES;
DEPOSITIONS, SUPPRESSION OF.

1. In an interference proceeding, the burden is upon the later applicant to
   show that he conceived the invention before the other applicant, and
   that he reduced it to actual practice, or was exercising due diligence
   in prosecuting his invention when the other entered the field.

2. A physician's affidavit as to the mental and physical condition of a
   witness, the cross-examination of whom was suspended because of his
   illness, attached to the deposition of the witness, forms no part of
   the deposition, but the affiant should be called and sworn as a witness.

3. The direct examination of a witness, as it appears in a deposition,
   should have been excluded, and is entitled to no weight, where it
   appears that his cross-examination was suspended because of his ill-
   ness after a few questions had been asked, and his counsel refused
   to extend the time for taking the testimony.

4. In an interference case involving priority of invention of an arrange-
   ment for closing at the same time, by a swinging door and a sliding
   door, openings in a smoke house or refrigerator, where it appeared,
   *inter alia*, that the cross-examination of the junior applicant was
   not completed because of his illness; that his son, who was one of
   his assignees, assisted his father to refresh his memory as to the date
   of his conception of the invention; that the important facts stated
   by the witnesses for such applicant were stated in answer to leading
   questions; that the witnesses differed by a year as to the date when
   a model was completed, from which it was claimed, but only shown by
   inference, that thirty-three doors were subsequently made, and that it
   was not shown, as it might readily have been, that the doors as con-
   structed embodied the invention of the issue,—a decision of the Com-
   missioner of Patents awarding a priority to the senior applicant was
   *affirmed*.

5. This court is not warranted in reversing a decision of the Commissioner
   of Patents, in an interference case, because of a mere doubt of its
   correctness.

No. 404.  Patent Appeals.  Submitted January 11, 1907.  Decided February
5, 1907.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference proceeding.          *Affirmed.*

The facts are stated in the opinion.

*Mr. J. Warner Beckstrom* and *Mr. Joseph R. Edson* for the appellant.

*Mr. Charles W. La Porte, Mr. Samuel Herrick,* and *Mr. Frank J. Kent* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

This is an interference proceeding involving priority of invention of the following issue:
"The combination, with a door opening, of a swinging door and a pair of slide doors arranged to close said opening, and connections between all of said doors, whereby same are caused to open and close simultaneously.

"2. The combination, with a door opening, of an angularly movable door and a pair of slide doors for closing said opening, and means between all of said doors for opening and closing them together.

"3. The combination with a single door opening of a swinging door, a pair of superposed sliding doors movable toward and from each other, a lever, means for moving said sliding doors in opposite directions by said lever, and means for actuating said lever by said swinging door."

The invention of this issue is an arrangement of certain elements which co-operate to close at the same time two openings in a smoke house or a refrigerator.  The larger opening is closed by a swinging door.  A smaller opening immediately above is closed by a pair of slide doors which are caused to move into position by the swinging of the larger door.

Andreas P. Munster, the junior party, claims to have con-ceived the invention September 1, 1902, and to have reduced

it to practice May 1, 1903. His application was filed May 27, 1904. John W. Ashworth [the senior party], who filed March 21, 1904, claims conception January 1, 1903, the making of a model March 1, 1903, but no actual reduction to practice.

The Examiner of Interferences decided in favor of Ashworth. His decision was reversed on appeal to the Examiners-in-Chief; and they, in turn, were reversed by the Commissioner, who awarded priority to Ashworth. From his decision, Munster has prosecuted this appeal.

The burden was upon Munster, as the later applicant, to show that he conceived the invention before Ashworth, and that he reduced it to actual practice, or was exercising due diligence in prosecuting his invention when Ashworth entered the field.

It seems sufficiently clear that unless he reduced to actual practice, as claimed, he was lacking in the required diligence. His case turns, therefore, upon the proof of reduction to practice.

We confess embarrassment in the determination of this question. The difficulty lies in the meagerness of the testimony and the manner in which it was taken. In the first place, Munster, having testified on his own behalf, was not subjected to cross-examination. He was undoubtedly in bad health, but we are not satisfied that he could not have been cross-examined later. After answering a few questions of opposing counsel, he announced that he was not well and was unable to stand the strain of cross-examination. Counsel for Ashworth expressed willingness to suspend, and asked Munster's counsel to extend the time of taking the testimony. The record shows that Munster's counsel refused "to delay indefinitely the determination of the issue of this interference, especially in view of the aimless trend of cross-examination." He further announced that Munster's mental and physical condition is such that he is unable to stand the strain imposed upon him as a witness; that he has been sick for over a year, has spent most of his time in a hospital; has undergone three different operations; has come to the hearing in a plainly emaciated condition, without appre-

ciating what is required of him; and that the prospect of his being able to testify within a year, if at all, is very slight.

As these conditions were so well known to his counsel, he should either have refrained from offering him as a witness on his own behalf, or, having done so, should have consented to some reasonable postponement. There was no testimony tending to show that Munster might not be able to appear for cross-examination within some reasonable period. The examination of other witnesses heard at the same time was concluded on June 14, 1905. An affidavit of a physician is attached to the record of the deposition as made July 20, 1905, to the effect that he had treated Munster from time to time for a year last past; that three different surgical operations had been performed on him to remove gall stones; that he has not been for many months past in a condition to withstand the strain imposed upon a witness; and that his present condition does not hold out any hope that he will be able to resume active mental and physical labors for perhaps years to come, if at all. An affidavit of this kind forms no part of a deposition. The affiant should have been called and sworn to testify as a witness. Under the circumstances, the direct examination ought to have been excluded on motion, and is entitled to no weight. That his testimony, if considered, is entitled to little or no weight, is shown in the direct examination of his son, Nicholas Munster, who testified on the same day. The question of appellant's counsel, and witness's answer thereto are as follows:

Q. 28. In your father's testimony he appears to have dates badly mixed. How did you manage to get the date for the preliminary statement, and how does it happen that your father today seems utterly unable to remember what he has heretofore done?

A. When the preliminary statement was made up I was at home with my father, he was rested and mentally collected. We went over the matter together at that time, and I assisted him to refresh his memory. Today the trip weakened and confused him, apparently, so that his mind is in a muddle.

The notice to take testimony for Munster at that time re-
cites the name of Munster only as the witness to be examined.
After Munster retired, three others witnesses were produced.
The record recites that Ashworth's counsel stated that he had
no objection to the examination of the other witnesses, and did
not care to cross-examine them, and then left. Ashworth moved
to suppress these depositions because taken without notice, and
filed an affidavit of his counsel denying the correctness of the
recital that he had waived objections to the examination of
witnesses not named in the notice. This motion was overruled.
The testimony was therefore considered as properly in the case.
It is to be observed of this testimony that the important facts
were stated in answer to leading questions propounded to the
witnesses. The following question to Nicholas Munster is an
example:

Q. 36. Are you positive that your father conceived the in-
vention set forth in this declaration of interference on or about
the 1st day of September, 1902, according to the preliminary
statement, which you helped your father prepare?
A. Yes, sir.
(See also Question 12 and answer hereafter.)

Questions asked this witness, who is also one of the assignees
of his father's invention, relating to the construction of doors
in accordance with the model of his father, together with his
answers, are as follows:

Q. 12. A. P. Munster's preliminary statement says that he
built some thirty three doors for Armour and Co. in 1903; is
this model exactly like those doors?
A. Yes, sir.
Q. 13. When were these doors put up, if you know?
A. He began to build them in May, 1903.
Q. 14. About when were they completed, to your knowledge?
A. Some time in October, 1903.

The witness did not describe the construction of the doors,

D. C.] .                        Opinion of the Court.

or undertake to say where or how they had been made. To the question asking if they were exactly like the model, he simply answered yes.

The next witness, Heinig, is also an assignee of Munster's invention. He said that he first heard of the invention in September, 1902, at which time Munster's son Nicholas showed him a partly completed model. He did not see this model in a completed state until the application for patent had been made. As regards the completion of this model, Heinig differs from Nicholas Munster who said it was completed in September, 1902. Heinig also testified that he was not interested in the invention prior to the time of filing the application for patent, and gives that as his reason for not having then seen the doors, of which he had heard of the construction. He said that after the application had been filed he went to Armour's plant in Chicago, where Munster and his witnesses lived, and labeled thirty-three doors, "Patent applied for." He was not asked to describe the construction of these doors, or their mode of operation. He says he had heard that they had been used there about a year; and all that he did was to "label them." The testimony of the remaining witness, Klotz, who was Munster's attorney, had no relation to this question; it was introduced for an entirely different purpose.

Assuming that thirty-three doors were erected in the Armour plant, of a construction designed by Munster, the testimony does not show, save by inference derived in part from hearsay, that these doors were constructed from the completed model of Munster, and embodied the elements of the issue. It does not appear how they worked. If these doors were constructed by Munster for the Armour Company in accordance with the requirements of the issue, and then used by them as answering the purpose, we cannot understand why some member or competent employee of that company was not called to testify. The plant was situated in Chicago, and such witness or witnesses could have proved the necessary facts, if they existed, beyond the shadow of a doubt. Yet none were called, and no reason

was suggested for the omission. In this connection it is perti-
nent to call attention to the fact that in the cross-examination
of Ashworth he was asked if he had seen or heard of the doors
put by Munster in the Armour plant. His answer was that he
had heard of them after the declaration of interference, and
had visited the plant for the purpose of seeing them; but that,
after being shown through the visitor's department, he had
asked if he could see the smokehouse where they had rails run-
ning through an opening in the smokehouse door, and that his
request had been politely denied. He also said that he had
shown the invention to the Armour Company immediately after
applying for a patent, and had not been informed by them that
they were already supplied. No effort was made to contradict
these statements.

Though not without some apprehension that Munster may
have made the invention and reduced it to practice, we are
constrained to affirm the decision of the Commissioner. We
are not warranted in reversing his decision because of a mere
doubt of its correctness. As before suggested, all doubt might
have been removed if the doors erected in the Armour plant
were in fact successful reductions to practice of the invention of
the issue, by the production of witnesses who could not be mis-
taken. The failure to do this was the fault of the appellant.

The decision awarding priority to Ashworth will therefore
be affirmed. The clerk will certify this decision to the Com-
missioner of Patents as required by the law.        *Affirmed.*

A petition by the appellant for a rehearing, filed February
21, 1907, was denied March 6, 1907.